# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| APRIL LYNN WOODRING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:16-cv-02914-TWP-MPB |
| | ) |
| NANCY A. BERRYHILL,[1] Acting Commissioner | ) |
| of the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff April Lynn Woodring ("Woodring") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying her applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), and Supplemental Security Income ("SSI") under Title XVI of the Act.[2] For the following reasons, the Court **REMANDS** the decision of the Commissioner for further consideration.

## I.     BACKGROUND

### A.     Procedural History

On December 17, 2012, Woodring filed applications for DIB and SSI, alleging a disability onset date of January 9, 2011, due to neck and shoulder pain, postural abnormalities, spondylolisthesis, depression, anxiety, chronic obstructive pulmonary disease ("COPD"), asthma,

---

[1] Nancy A. Berryhill is now the Acting Commissioner of the Social Security Administration ("SSA"). Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Commissioner Carolyn W. Colvin as the defendant in this suit.

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this entry should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

and obesity. The claim was initially denied on April 5, 2013, and again on reconsideration on July 23, 2013. On August 15, 2013, Woodring filed a request for a hearing.

A hearing was held before Administrative Law Judge Jason C. Earnhart (the "ALJ") on April 1, 2015. Woodring was present and represented by counsel. Thomas A. Grzesik, a vocational expert, appeared and testified at the hearing. On May 6, 2015, the ALJ denied Woodring's applications for DIB and SSI. Following this decision, on May 26, 2015, Woodring requested review by the Appeals Council. On August 27, 2016, the Appeals Council denied Woodring's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. On October 26, 2016, Woodring filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## B.    **Factual Background**

At the time of her alleged disability onset date, Woodring was thirty-six years old, and she is now forty-three years old. Woodring attended formal schooling through the tenth grade, but she did not complete her high school education and did not earn a GED. Prior to the onset of her alleged disability, Woodring had an employment history working as a taxi driver, a cashier/checker, and a meat counter clerk.

Woodring's history of anxiety and depression dates back to at least September 2009 (Filing No. 8-8 at 29). Woodring began experiencing severe anxiety and having panic attacks around May 2010. At that time, Woodring had an experience where her hands were shaky, she had chest pain and shortness of breath, and she could not get out of her car. The anxiety subsided, but it came back with more intensity in November 2010. She sought treatment for her anxiety from her primary care physician. She was prescribed medication to address her anxiety, but it made her sick, so she tried various other medications (Filing No. 8-7 at 17).

On January 10, 2011, Woodring experienced a panic attack and went to a hospital emergency room to seek treatment (Filing No. 8-12 at 40, 46). She was discharged from the emergency room and immediately began experiencing panic attacks again, so she sought additional treatment the next day (Filing No. 8-13 at 85). She again went to the hospital emergency room on January 14, 2011 because of anxiety and panic attacks (Filing No. 8-7 at 20). Throughout January 2011, Woodring went to various health care providers to seek treatment for her anxiety and depression (Filing No. 8-8 at 25–29; Filing No. 8-13 at 83). On January 19, 2011, Woodring began receiving consistent, regular therapy from licensed clinical social worker Abigail Michael ("Ms. Michael") for depression and anxiety (Filing No. 8-8 at 25).

On February 11, 2011, Woodring had an individual therapy session with Ms. Michael to explore her past abuse and her anxiety. *Id.* at 33. She was referred to psychiatrist Alfredo J. Tumbali, M.D. ("Dr. Tumbali"). Dr. Tumbali conducted a psychiatric evaluation of Woodring on February 14, 2011 (Filing No. 8-7 at 17). Dr. Tumbali diagnosed Woodring with depressive disorder and anxiety disorder and assigned her a global assessment of functioning ("GAF") score of 55. He recommended continued individual therapy with her therapist, and he prescribed new medication. He noted that he would continue to see Woodring for medication management. *Id.* at 18.

Woodring continued to receive individual therapy from Ms. Michael from March 1, 2011 into 2013 (Filing No. 8-8 at 36–53). She continued to exhibit depression, anxiety, and panic attacks during that time period, however, there were periods of progression. During her therapy session with Ms. Michael in July 2011, Woodring completed a cost/benefit analysis of returning to work. She decided that she would ask her employer if she could return to work on a reduced schedule. *Id.* at 42. During subsequent therapy appointments, she was anxious, agitated, and tearful.

Woodring had been doing more driving, but during her therapy session in November 2011, she reported experiencing another panic attack while driving and was fearful to drive. *Id.* at 46. In July 2012, Woodring reported to Ms. Michael that she had been driving her mother to appointments and had applied for some jobs. *Id.* at 51. Woodring attempted to work at a small grocery store in December 2012, but she quit after the first day because of a panic attack. She also experienced a panic attack in a Walmart parking lot and had to have her boyfriend take her home. *Id.* at 65.

During this 2011 and 2012 time period, Woodring continued to receive treatment, including medications, from Dr. Tumbali for her anxiety and depression. In June 2011, Woodring reported increased anxiety. A mental status examination revealed an anxious mood. Dr. Tumbali prescribed Xanax and Lexapro. Woodring appeared less anxious at her next appointment, and Dr. Tumbali continued recommending outpatient therapy, which Woodring was receiving. In September 2011, Woodring stated that she still felt anxious, and her mental status examination revealed a depressed and anxious mood. A mental status examination in November 2011 revealed a less depressed and anxious mood. Woodring's anxiety and depression seemed to be managed by her ongoing therapy and medication throughout her visits with Dr. Tumbali through August 2012. At the October 2012 appointment, Woodring stated that she felt stressed, and the mental status examination revealed a depressed and anxious mood. Dr. Tumbali prescribed Xanax and Wellbutrin. In November 2012, Woodring appeared to be doing better, but by March 2013, she had more anxiety, depression, and panic attacks (Filing No. 8-11 at 44–57).

On January 22, 2013, Woodring was admitted to a psychiatric hospital because of increased depression. She was tearful and had stayed in bed over the previous two weeks with little regard for self-care. She had been having suicidal thoughts with a plan to overdose. She was sleeping

more than twelve hours a day, and when she was going to sleep, she wished that she would not wake up ([Filing No. 8-8 at 57]). Woodring's GAF score was 30 at admission. Psychiatrist Thomas E. Kreider, M.D., diagnosed depressive disorder and personality disorder among other things. She was treated with Wellbutrin and Xanax and discharged on January 25, 2013. Her GAF score was 45 upon discharge. *Id.* at 66, 68–69. After being discharged, Woodring resumed treatment and therapy with Dr. Tumbali and Ms. Michael.

During her May 28, 2013 appointment with Dr. Tumbali, Woodring reported that she could not drive because she still was having panic attacks. Her mental status examination revealed an anxious mood ([Filing No. 8-11 at 43]). On August 6, 2013, Dr. Tumbali completed a psychiatric/psychological impairment questionnaire regarding Woodring. He noted diagnoses of anxiety disorder and depressive disorder. He opined that she had a GAF score of 55. He noted the following clinical findings to support his diagnoses: appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, hostility and irritability, overall sad mood, excessive worry, racing thoughts, and fear of crowded places. Woodring's primary symptoms were panic attacks, anxiety, avoidance of social situations, and lack of motivation. Dr. Tumbali opined that Woodring's prognosis was poor. He also opined that Woodring was markedly limited in the areas of concentration and persistence, social interactions, and adaptation ([Filing No. 8-9 at 94–101).

Woodring continued receiving treatment and therapy from Dr. Tumbali and Ms. Michaels, and on March 23, 2014, she was admitted to the St. Vincent stress center because she was

experiencing increased panic like symptoms and anxiety. She was fearful of leaving her home and having panic attacks in public. She was experiencing shaking, shortness of breath, and an extreme sense of dread. She had increased depression, crying spells, low energy, low confidence, and difficulty sleeping. She was treated with various medications and discharged a few days later (Filing No. 8-12 at 54–55). Woodring again returned to Dr. Tumbali and Ms. Michaels after her discharge from the stress center. In March 2015, Ms. Michael completed a mental impairment questionnaire similar to Dr. Tumbali's psychiatric/psychological impairment questionnaire. Ms. Michaels reached similar conclusions regarding Woodring's impairments as those found by Dr. Tumbali (Filing No. 8-13 at 71–75).

Approximately one year before she was admitted to the stress center but soon after filing her applications for DIB and SSI, Woodring underwent a consultative psychological evaluation with Michele Koselke, Psy.D. ("Dr. Koselke"), at the request of the Social Security Administration. Woodring reported she had been unable to work because of depression and anxiety with panic attacks. She discussed her bi-weekly counseling, explaining that it had been helpful but had not eliminated her anxiety and depression. She also discussed her inpatient hospital treatment from January 2013, explaining that it was not helpful and actually made her anxiety and depression worse. Woodring noted that she had difficulty sleeping and had lost forty pounds in the previous three months. Woodring's mental status examination revealed clinical impressions of anxiety disorder, alcohol dependence in remission, and poly-substance dependence in remission, with a GAF score of 69. Dr. Koselke opined that Woodring was in the average range for functioning, and she was able to focus for one hour, get along with others, and follow directions (Filing No. 8-9 at 3–7).

Regarding her physical impairments, Woodring went to the hospital emergency room on January 16, 2011 because of neck and back pain (Filing No. 8-7 at 30). On November 8, 2012, Woodring was examined by Melissa M. Roche, M.D. ("Dr. Roche"), for chronic neck and shoulder pain that had been going on for many years (Filing No. 8-8 at 8). Dr. Roche recommended physical therapy, so Woodring was evaluated by Christie DeCraene, P.T., for physical therapy to address her neck, shoulder, and upper back pain. *Id.* at 75. Following the evaluation, it was noted that Woodring had T1 through T3 flexion dysfunction, pectoralis minor restriction, and postural dysfunction. A physical therapy plan was established to correct these issues. *Id.* at 75–76. Woodring participated in physical therapy about two times a week through November and December 2012. *Id.* at 77–78.

In November 2012, Woodring underwent pulmonary function testing, which revealed moderate obstructive airway disease. The objective results of the test were above listing level severity. It was noted that Woodring had a significant response to and improvement with bronchodilators (Filing No. 8-8 at 15–16). On December 11, 2012, Woodring went to Dr. Roche for chest pain, a cough, and a sore throat. Dr. Roche noted that Woodring's ongoing COPD was exacerbated. *Id.* at 6. Progress notes from late 2012 and into early 2013 indicate that Woodring continued to seek ongoing treatment and care for her chronic back and neck pain, as well as her COPD and asthma. It was noted that physical therapy had been unsuccessful at resolving her back and neck pain. *Id.* at 2–8. Chest x-rays in January 2013 revealed streaky perihilar densities with associated peribronchial cuffing. *Id.* at 87. During her January 2013 visit with Dr. Roche, it was noted that Woodring's lungs were clear and respiration normal. It appeared that her medications were helping her to improve her asthma and COPD. *Id.* at 4.

In June 2013, Woodring underwent a second pulmonary function test, which revealed a moderate obstruction and mild upper respiratory restriction, with one measure below listing level severity, but the test results had a variance (Filing No. 8-9 at 79–81). One month later in July 2013, Woodring underwent a third pulmonary function test, which revealed results back above listing level severity. *Id.* at 85–87.

In October 2013, Woodring saw Carleigh Wilson, D.O. ("Dr. Wilson") because she was experiencing shortness of breath, a cough, and shoulder and neck pain. Dr. Wilson noted that Woodring's COPD was stable but still an ongoing impairment, so she prescribed medications to address the cough and any potential bronchitis (Filing No. 8-10 at 24–25). Dr. Wilson recommended that Woodring receive physical therapy to help with her back and neck pain, so she started physical therapy again. *Id.* at 4–12. Dr. Wilson continued to treat Woodring through at least June 2014 for her back and neck pain and COPD (Filing No. 8-13 at 33–43).

On December 6, 2013, Dr. Wilson completed a pulmonary impairment questionnaire for Woodring. She noted Woodring's diagnosis of COPD, and a good prognosis with the need to quit smoking. Dr. Wilson noted clinical findings of shortness of breath, chest tightness, wheezing, rhonchi, episodic acute bronchitis, fatigue, and coughing. Woodring's primary symptoms were back, shoulder, and neck pain as well as frequent respiratory infections. She also suffered from acute asthma attacks precipitated by upper respiratory infections and cold air/change in weather. Dr. Wilson opined that, during asthma attacks, Woodring was incapacitated for minutes to hours at a time. Dr. Wilson further opined that in an eight-hour workday Woodring could sit for two hours and stand/walk for one hour, and she could lift/carry up to ten pounds frequently. Dr. Wilson opined that Woodring would need to take unscheduled breaks to rest every one to two hours for about fifteen to twenty minutes. She was likely to have good days and bad days, and she was

likely to be absent from work more than three times per month. Dr. Wilson concluded that Woodring would need to avoid temperature extremes, wetness, humidity, odors, fumes, dust, perfumes, gases, chemicals, cigarette smoke, fluxes, and solvents/cleaners (Filing No. 8-12 at 24–30).

At the hearing before the ALJ, Woodring testified that she has anxiety attacks approximately two to three times per week even when taking medication. Her COPD and breathing problems exacerbate her anxiety and vice versa. Woodring testified that during anxiety attacks she experiences a racing heartrate, shortness of breath, nausea, shaking, dizziness, and difficulty sleeping. Her anxiety attacks last an average of two to three minutes but can last up to twenty minutes. She explained that after anxiety attacks she needed to lay down and sleep for two to three hours. Woodring testified that she gets all worked up and dreads upcoming events (Filing No. 8-2 at 71–73, 79–80, 87–88).

During the administrative hearing, the vocational expert ("VE") was asked to consider an individual of Woodring's age, education, and work history who was limited to light work and who could tolerate frequent exposure to extreme temperatures, wetness, humidity, atmospheric conditions, and pulmonary irritants; limited to simple, routine, repetitive tasks with no fast-paced production; work in no more than small groups with occasional interactions with co-workers and supervisors and no interaction with the public; and only occasional changes in the work setting. The VE testified that such an individual could not perform Wooding's past work but could work as a mail clerk, a house cleaner, or a routing clerk. The VE testified that if the individual were further limited to sedentary work then they could work as an order clerk, a charge account clerk, or a call out operator. However, if the individual was off task twenty percent or more in a given work day or was absent from work at least one day per week, they would be precluded from all

work.  In addition, if the individual was unable to ask simple questions or request assistance, she would be unable to perform any of the jobs identified (Filing No. 8-2 at 89–93).

## II.  DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after she establishes that she is disabled.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled.  At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors.  20 C.F.R. § 416.920(a)(4)(i).  At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled.  20 C.F.R. § 416.920(a)(4)(ii).  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled.  20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the

fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold the ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build

a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III.   THE ALJ'S DECISION

The ALJ first determined that Woodring met the insured status requirement of the Act through December 31, 2015. The ALJ then began the five-step sequential evaluation process. At step one, the ALJ found that Woodring had not engaged in substantial gainful activity since January 9, 2011, her alleged disability onset date. At step two, the ALJ found that Woodring had the following severe impairments: COPD, asthma, obesity, depression, and anxiety. At step three, the ALJ concluded that Woodring did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then determined that Woodring had the following RFC:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours in an 8 hour workday, and sit for 6 hours in an 8 hour workday. The claimant is limited to frequent exposure to extreme temperatures; wetness; humidity; and atmospheric conditions, including pulmonary irritants. The claimant is further limited to simple, routine, repetitive tasks; with no fast production pace; with the work limited to no more than small groups; occasional interaction with co-workers and supervisors; no in-person interaction with the public; and only occasional changes in the work setting.

(Filing No. 8-2 at 33-34).

At step four, the ALJ determined that Woodring was unable to perform her past relevant work as a taxi driver, a cashier/checker, or a meat counter clerk because the demands of this past relevant work exceeded Woodring's RFC. At step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Woodring could perform. Having determined that Woodring could perform work in other jobs in the economy, the ALJ determined that Woodring was not disabled. Therefore, the ALJ denied Woodring's applications for DIB and SSI because she was found to be not disabled.

## IV.   DISCUSSION

In her request for judicial review, Woodring advances two arguments for remanding this case to the ALJ for further consideration. First, Woodring argues that the ALJ erred by failing to properly weigh the opinions of her medical providers. Second, Woodring asserts that the ALJ erred by failing to properly evaluate her credibility.

### A.    The ALJ's Consideration of the Medical Opinions

Woodring explains that the medical opinion of a treating physician is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). "An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). If a treating physician's medical opinion is not given "controlling weight," the ALJ must "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740.

Woodring asserts that her case should be remanded for further consideration because the ALJ did not properly weigh or explain his rationale for the weight given to the medical opinions of the treating medical providers: Dr. Tumbali, Ms. Michael, and Dr. Wilson. Woodring also asserts that the ALJ failed to state what weight he gave to the SSA's own consultative psychologist, Dr. Koselke.

### 1.    <u>Dr. Tumbali</u>

Concerning Dr. Tumbali's medical opinions, Woodring argues that the ALJ erred by not providing specific reasons for giving a treating physician's opinions only little weight. Rather, the ALJ provided only a conclusory finding that the opinion was not worthy of great weight, or even controlling weight. Woodring asserts that Dr. Tumbali's opinions were supported by medically acceptable clinical findings and were not inconsistent with the record evidence. Thus, as a treating physician, Dr. Tumbali's opinion was entitled to controlling weight. Woodring points to the clinical findings supporting Dr. Tumbali's opinions of debilitating anxiety and depression: appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, hostility and irritability, overall sad mood, excessive worry, racing thoughts, and fear of crowded places. Woodring argues that these clinical findings support not only a finding of severe anxiety and depression but also Dr. Tumbali's opinion that Woodring was markedly limited in her functioning.

Woodring also asserts that the ALJ erred by relying heavily only on the GAF scores between 50 and 59 because GAF scores have been rejected by the American Psychiatric

Association as diagnostic tools for assessing functioning because of a GAF score's questionable probative value. Woodring points out that the Commissioner has diminished the value of using GAF scores because the scores do not correlate to the severity requirements of the SSA's mental disorders listings. *See* 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000).

The ALJ erred, Woodring argues, by giving greater weight to the opinions of non-examining state-agency psychologists over the opinions of the treating psychiatrist. Woodring notes that it appears from the record that the reviewing state-agency psychologists did not review the full record and only considered the report from the SSA's consultative examiner, Dr. Koselke. Additionally, Woodring argues the ALJ erred by not giving any consideration to the factors for weighing opinion evidence found in 20 C.F.R. § 404.1527 when weighing Dr. Tumbali's opinions. The ALJ did not consider the length, nature, and extent of the treatment relationship, frequency of examination, Dr. Tumbali's specialty, the types of tests performed, and the consistency and supportability of Dr. Tumbali's opinion.

The Commissioner responds that the ALJ fully explained his reasoning for the weight given to Dr. Tumbali's opinions, and this decision was supported by the medical opinions of the state-agency psychologists, Dr. Pressner and Dr. Shipley. Dr. Pressner relied on Dr. Koselke's report from Woodring's mental status examination for his opinion that Woodring was able to perform semi-skilled work without strangers or large groups. Dr. Shipley agreed with Dr. Pressner's opinion. The Commissioner argues that this is substantial evidence to support the ALJ's decision and to discount the weight given to Dr. Tumbali's opinion.

The Commissioner further asserts that the ALJ sufficiently explained that Dr. Tumbali's clinical findings and treatment notes throughout the record undermined his later, more severe findings, which led to the decision to give his opinions less weight. Additionally, while GAF

scores do not correlate precisely with SSA functioning standards, the GAF scores are still helpful in determining a claimant's level of functioning. And the ALJ properly reduced the weight given to Dr. Tumbali's opinion of marked limitations because that opinion clashed with Dr. Tumbali's own finding of GAF scores of 55. Concerning the factors listed in 20 C.F.R. § 404.1527, the Commissioner asserts that the ALJ's "decision need only include good reasons for the weight given to the treating source's opinion rather than an exhaustive factor-by-factor analysis." *Richards v. Colvin*, 2016 U.S. Dist. LEXIS 9855, at *21 (N.D. Ind. Jan. 27, 2016). The ALJ's decision indicates that he considered the factors when determining the weight to give Dr. Tumbali's opinion. The ALJ properly considered the factors and explained that Dr. Tumbali's own treatment notes and assignment of a GAF score of 55 contradicted the opinion of marked limitations, and thus, that opinion was given lesser weight.

The Court finds that the ALJ assigned great weight to Dr. Tumbali's February 2011 diagnoses of anxiety and depression and GAF score of 55 (Filing No. 8-2 at 35). However, the ALJ then gave little weight to Dr. Tumbali's later assessments that Woodring suffered marked limitations. *Id.* at 41. While the ALJ did not specifically list the clinical findings noted in Dr. Tumbali's later reports, it is clear that he considered those clinical findings when determining Woodring's limitations and how much weight to give Dr. Tumbali's conclusions. The ALJ explicitly described his comparison between Dr. Tumbali's later conclusion and Dr. Tumbali's earlier findings as well as the clinical observations of Dr. Koselke and her opinions. The ALJ explained the conflict between Dr. Tumbali's opinion of marked limitations and the opinions of the state-agency psychologists who determined a higher level of functioning. The ALJ was justified in giving lesser weight to Dr. Tumbali's later opinion based on his explanation that Dr. Tumbali's own treatment notes and assignment of a GAF score of 55 contradicted the later opinion.

Furthermore, while the ALJ did not explicitly list the various factors of 20 C.F.R. § 404.1527, it appears that those factors were considered as they were touched upon throughout the ALJ's decision.

Throughout the ALJ's decision, he explained why greater weight was given to particular opinions while lesser weight was given to Dr. Tumbali's later opinion. These decisions were based on the medical evidence. The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ. *Overman*, 546 F.3d at 462. The ALJ's decision provided a path of reasoning and built a logical bridge between the evidence and the conclusions. For these reasons, the Court concludes that Woodring's arguments about Dr. Tumbali's opinions do not justify remand and reconsideration.

## 2. **Ms. Michael**

Next, Woodring argues the ALJ erred by ignoring the opinions of Ms. Michael based on the fact that she was a licensed clinical social worker and not an "acceptable medical source." Woodring asserts that Ms. Michael's opinions were consistent with the opinions of Dr. Tumbali, and she had treated Woodring for anxiety and depression over a period of years, so her opinions should have been considered and weighed rather than ignored. Woodring argues that the opinions from non-acceptable medical sources should be considered in determining the severity of a claimant's impairment and how it affects the claimant's ability to do work, citing 20 C.F.R. § 404.1513 and § 416.913. Woodring argues that the factors for weighing opinion evidence found in 20 C.F.R. § 404.1527 and Social Security Ruling 06-03p support giving Ms. Michael's opinions great weight. Woodring asserts that the ALJ erred by failing to consider these factors and then giving Ms. Michael's opinions great weight.

The Commissioner responds that Ms. Michael's opinions are owed no deference and only limited consideration according to SSR 06-03p because Ms. Michael is not an acceptable medical source. The Commissioner asserts that opinions from "other sources" cannot establish medically determinable impairments, are not entitled to controlling weight, and may be rejected simply because they clash with opinions from acceptable medical sources. The Commissioner argues that the ALJ reasonably explained that Ms. Michael's opinion deserved little weight because she was not an acceptable medical source and her opinions regarding Woodring's limitations and inability to work clashed with the opinions of the state-agency psychologists, who are acceptable medical sources.

The Court concludes that the decision of the ALJ provides an adequate explanation, supported by evidence, of the ALJ's consideration of Ms. Michael's opinions and the weight given to them. The ALJ explained that Ms. Michael's opinions were considered and given little weight or not given significant weight. The ALJ further explained that an August 2013 letter from Ms. Michael was of little value because it explained no specific limitations to Woodring's work abilities and instead stated in conclusory fashion that she was unable to work (Filing No. 8-6 at 59). The ALJ also explained that Ms. Michael's mental impairment questionnaire was given little weight because she is not an acceptable medical source and, in the ALJ's view, the limitations were not consistent with the record evidence (Filing No. 8-2 at 41). The ALJ's consideration and discussion of Ms. Michael's opinions was sufficient in light of her status as a non-acceptable medical source. Therefore, the Court determines that Woodring's arguments concerning Ms. Michael's opinions do not warrant remand.

### 3. Dr. Koselke

Woodring also argues that the ALJ erred by failing to state what weight was given to the opinion of the SSA's own consultative psychologist, Dr. Koselke. Woodring asserts that Dr. Koselke opined she could focus for only one hour, and the ALJ failed to take that into consideration when determining disability. The Court determines that this argument lacks merit. As the Commissioner correctly points out, Woodring misreads the report from Dr. Koselke, which opined that Woodring's "ability to focus for one hour is good." ([Filing No. 8-9 at 7](#).) It is clear that Dr. Koselke was describing Woodring's ability to focus well during her one hour evaluation, not limiting Woodring to an ability to focus for only one hour. Additionally, the Court notes that the ALJ described how much he relied on Dr. Koselke's opinion throughout his decision; although the ALJ may not have used the terms "great weight" or "little weight," a review of the decision shows that the ALJ relied on and gave weight to Dr. Koselke's opinions. Woodring's brief argument concerning Dr. Koselke's opinions do not warrant remand.

### 4. Dr. Wilson

Lastly, Woodring argues that the ALJ's consideration of Dr. Wilson's opinions was erroneous and warrants remand. She points out that the ALJ gave mixed weight to Dr. Wilson's opinions, giving great weight to the opinion regarding lifting and environmental limitations with only little weight given to the opinion regarding unscheduled breaks and missing days of work. Woodring argues that the ALJ erred by not explaining whether he considered or gave any weight to Dr. Wilson's opinion regarding Woodring's sitting, standing, and walking limitations. Quoting *Whitney v. Schweiker*, Woodring asserts that "an ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion." 695 F.2d 784, 788 (7th Cir. 1982).

Woodring further argues that the ALJ did not identify what specific evidence contradicted Dr. Wilson's opinion about unscheduled breaks and absences from work, and the ALJ did not explain any inconsistency between the evidence and Dr. Wilson's opinion. She asserts that the factors for weighing opinion evidence found in 20 C.F.R. § 404.1527 were not considered by the ALJ when reviewing Dr. Wilson's opinions, and those factors support giving Dr. Wilson's opinion greater weight. Woodring also asserts the ALJ erred when he gave some weight to the non-examining state-agency physician's opinion, whose review of the record was limited to older evidence predating July 22, 2013, which did not include Dr. Wilson's more recent opinions. Additionally, the ALJ did not cite any medical evidence supporting his conclusion that Woodring could sit for six hours and stand/walk for six hours during an eight-hour workday. There was no evidence to support that conclusion, and nothing contradicted Dr. Wilson's more restricted medical opinion. Thus, Woodring asserts, the ALJ erred in his review of and conclusions about Dr. Wilson's opinions.

The Commissioner responds that the reviewing court looks at the ALJ's decision as a whole, and in this case, the ALJ's decision as a whole adequately explains why he gave certain portions of Dr. Wilson's opinions great weight and other portions little weight. The ALJ discussed the objective evidence of pulmonary impairments such as the pulmonary tests and physical examinations, and this objective evidence clashed with Dr. Wilson's opinion of more extreme pulmonary impairments and limitations. The Commissioner notes that the more recent progress notes from Dr. Wilson's treatment of Woodring shows improvement in Woodring's breathing and lungs. The Commissioner asserts the ALJ provided an adequate explanation for his decision to give little weight to portions of Dr. Wilson's opinions.

Woodring did not point to any authority requiring the ALJ to consider every aspect of Dr. Wilson's opinions, such as the sitting, standing, and walking limitations, and that any such error was harmless because the medical opinions about her breathing did not support limitations to sitting, standing, or walking. The Commissioner argues an ALJ does not need to rely on medical opinions to determine a claimant's functioning, citing to *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). And in any event, the ALJ balanced Dr. Wilson's opinion about sitting limitations against the opinion of the state-agency doctor, Dr. Brill, who opinioned that Woodring had no exertional limitations.

The Court first notes that the Commissioner's suggestion that *Diaz* stands for the proposition that an ALJ does not need to rely on medical opinions to determine a claimant's functioning is incorrect. The footnote in *Diaz* discussed an argument that the ALJ should have relied solely on physicians' opinions, but the court explained that an ALJ must consider the entire record including both medical and non-medical evidence when determining the RFC. *Diaz*, 55 F.3d at 306 n.2. The Court further notes that the ALJ did not balance Dr. Wilson's opinion about sitting limitations against the opinion of the state-agency doctor. The ALJ failed to analyze the specific sitting, standing, and walking limitations that were in the record and that suggested greater limitations than the ALJ determined were necessary. The ALJ should have at least minimally discussed those opinions from Dr. Wilson when determining the RFC.

An additional problem exists in the ALJ's decision concerning his treatment of Dr. Wilson's opinions. The ALJ specifically states that he gave "great weight" to Dr. Wilson's environmental limitations—"the need to avoid temperature extremes, wetness, humidity, and pulmonary irritants." (Filing No. 8-2 at 40.) Yet the ALJ's RFC states that Woodring could have "frequent exposure to extreme temperatures; wetness; humidity; and atmospheric conditions,

including pulmonary irritants." *Id.* at 33. The ALJ provides no explanation for this inconsistency. The ALJ failed to consider (or at least discuss) certain medical evidence from Dr. Wilson that opposed his decision and also failed to explain any rationale for giving great weight to Dr. Wilson's environmental limitations while contradicting those limitations in the RFC. These errors concerning the ALJ's treatment of Dr. Wilson's opinions warrant remand for further consideration.

**B.** **The ALJ's Credibility Assessment of Woodring**

Because of the Court's decision above to remand this case for further consideration, the Court only briefly addresses the second argument raised by Woodring. She argues that this case should be remanded because the ALJ failed to properly evaluate her credibility. She asserts that the ALJ used boilerplate language to discount her credibility, and he failed to fully consider the factors listed in SSR 96-7p when determining her credibility. Woodring also asserts that the ALJ erred in his analysis of Woodring's desire to return to work, her receipt of unemployment benefits, and her ongoing smoking habit as it pertains to her credibility. She argues the ALJ was wrong in his consideration of her treatment and the effectiveness of her treatment.

In response, the Commissioner explains that, when reviewing credibility determinations, the courts "merely examine whether the ALJ's determination was reasoned and supported. It is only when the ALJ's determination lacks any explanation or support that [the court] will declare it to be patently wrong and deserving of reversal." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (citations and quotation marks omitted). The Commissioner explains that the ALJ noted several inconsistencies between Woodring's subjective complaints and testimony and the other evidence in the record regarding her medical conditions, activities, and functioning. Those inconsistencies reasonably undermined Woodring's credibility. The Commissioner also asserts the ALJ appropriately considered Woodring's treatment and the medical records that indicated

treatment was effective when considering her credibility. Further, the Commissioner argues the ALJ was justified in reducing Woodring's credibility based on her sworn statements that she could work (when seeking unemployment benefits) but not work (when seeking disability benefits).

The Commissioner is correct in that the evidence supports the ALJ's credibility determination, and the explanation for the credibility determination is more than adequate. The credibility analysis was rational and supported. Woodring's credibility argument appears to be a disagreement with how the ALJ weighed and viewed the evidence. However, as noted above, the Court does not reweigh the evidence, and importantly, when reviewing credibility determinations, the "ALJ is in the best position to determine the credibility of witnesses, and we review that determination deferentially. We overturn a credibility determination only if it is patently wrong." *Craft*, 539 F.3d at 678 (citations omitted). There is nothing in the ALJ's credibility determination that is patently wrong that requires reversal and remand.

## V.    CONCLUSION

For the limited reason set forth above, the final decision of the Commissioner is **REMANDED** for further proceedings consistent with this Entry as authorized by Sentence Four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Date: 3/19/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Michael G. Myers
mgmyers10@sbcglobal.net

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov